## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

EQUAL MEANS EQUAL,
JANE DOE,
MARY DOE,
SUSAN DOE, and
THE NATIONAL COALITION AGAINST
VIOLENT ATHLETES,

     *Plaintiffs*,

v.

U.S. DEPARTMENT OF EDUCATION and
ELISABETH D. DEVOS, *in her official
capacity as Secretary of Education*,

     *Defendants*.

Civil Action No. 17-12043-MLW

Leave to file thirty page brief granted on
November 6, 2018.

## DEFENDANTS' MEMORANDUM OF REASONS IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

## TABLE OF CONTENTS

Introduction ........................................................................................................................... 1

Background ........................................................................................................................... 2

   I.    Statutory and Regulatory Background ................................................................... 2

   II.   OCR Guidance Documents .................................................................................... 3

   III.  The Parties ............................................................................................................. 5

      A.   The Organizational Plaintiffs ......................................................................... 5

      B.   The Individual Plaintiffs ................................................................................. 5

Legal Standard ..................................................................................................................... 7

Argument ............................................................................................................................. 8

   I.    Plaintiffs Lack Standing ........................................................................................ 8

      A.   EME Lacks Article III Standing. .................................................................... 8

      B.   NCAVA Lacks Article III Standing. ............................................................. 11

      C.   The Organizational Plaintiffs Lack Standing to Bring Their First Amendment Claim..
          ....................................................................................................................... 13

      D.   The Individual Plaintiffs Lack Standing. ...................................................... 14

   II.   The Court Should Dismiss Counts I through V Because Plaintiffs Do Not Challenge Final Agency Action and Because Plaintiffs Have an Adequate Alternative Remedy in a Court. ...................................................................................................................... 17

      A.   The 2017 Q&A Is Not Final Agency Action. ................................................ 17

      B.   Plaintiffs Have an Adequate Alternative Remedy. ....................................... 19

   III.  The Court Should Dismiss Count I Because Defendants Did Not Exceed Their Statutory Authority. ............................................................................................................... 22

   IV.  The Court Should Dismiss Count II Because the 2017 Q&A Is Not a Legislative Rule...
        ............................................................................................................................ 23

   V.   The Court Should Dismiss Counts IV and VII Because the 2017 Q&A Does Not Discriminate on the Basis of Sex. ............................................................................. 25

   VI.  The Court Should Dismiss Count VI Because The 2017 Q&A Does Not Regulate Speech. .................................................................................................................... 26

   VII.  The Court Should Dismiss Count VII Because Title IX Does Not Create a Cause of Action against the Federal Government in Its Capacity as Regulator. ..................... 27

   VIII.   The Court Should Dismiss Counts VIII And IX Because The 2017 *Q&A* Violates Neither The Spending Clause Nor The Tenth Amendment. ...................................... 29

   IX.  The Court Should Dismiss Count X Because the Declaratory Judgment Act Does Not Create a Cause of Action. ....................................................................................... 30

CONCLUSION ................................................................................................................. 30

# TABLE OF AUTHORITIES

**Cases**

*Akins v. Penobscot Nation,*
   130 F.3d 482 (1st Cir. 1997) ................................................................... 30

*Am. Legal Found. v. FCC,*
   808 F.2d 84 (D.C. Cir. 1987) ................................................................. 10

*Assoc. of Int'l Auto Mfrs., Inc. v. Comm'r, Mass. Dep't of Env'tl. Prot.,*
   208 F.3d 1 (1st Cir. 2000) ..................................................................... 18

*Ass'n for Retarded Citizens of Dall. v. Dall. Cty. Mental Health & Mental Retardation Ctr.*
   *Bd. of Trs.,* 19 F.3d 241 (5th Cir. 1994) ............................................... 13

*Ass'n of Flight Attendants-CWA v. Huerta,*
   785 F.3d 710 (D.C. Cir. 2015) .......................................................... 18, 19

*Baker v. Carr,*
   369 U.S. 186 (1962) ............................................................................... 14

*Barton v. Clancy,*
   632 F. 3d 9 (1st Cir. 2011) ..................................................................... 27

*Bauer v. DeVos,*
   325 F. Supp. 3d 74 (D.D.C. 2018) ......................................................... 24

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007) ................................................................................. 7

*Benjamin v. Fremont Inv. & Loan,*
   No. 17-11727, 2018 WL 4017595 (D. Mass. Aug. 22, 2018) .................. 6

*Bennett v. Spear,*
   520 U.S. 154 (1997) ............................................................................... 17

*Berkshire Envt'l Action Team, Inc. v. Tenn. Gas Pipeline Co., LLC,*
   851 F.3d 105 (1st Cir. 2017) ................................................................. 17

*Blum v. Holder,*
   744 F.3d 790 (1st Cir. 2014) ................................................................... 8

*Cabacoff v. Willis,*
   No. 16-11990-WGY, 2016 WL 7018522 (D. Mass. Nov. 30, 2016) ...... 18

*Cannon v. Univ. of Chicago,*
   441 U.S. 677 (1979) ................................................................................. 2

*Chrysler Corp. v. Brown*,
   441 U.S. 281 (1979) .......................................................................................... 23

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ................................................................................. *passim*

*Cmty. Nutrition Inst. v. Young*,
   818 F.2d 943 (D.C. Cir. 1987) ........................................................................ 23

*Cohn v. Brown*,
   161 F. App'x 450 (6th Cir. 2005) ................................................................... 15

*COPE v. Kan. State Bd. of Educ.*,
   821 F.3d 1215 (10th Cir. 2016) ...................................................................... 16

*Cousins v. Sec'y of the U.S. Dep't of Transp.*,
   880 F.2d 603 (1st Cir. 1989) .................................................................... 28, 29

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
   452 F.3d 798 (D.C. Cir. 2006) ........................................................................ 18

*Davis v. Monroe Cty. Bd. of Educ.*,
   526 U.S. 629 (1999) .................................................................................... 3, 29

*Draper v. Healey*,
   827 F.3d 1 (1st Cir. 2016) ......................................................................... 10, 13

*El Rio Santa Cruz Neighborhood Health Ctr. v. HHS*,
   396 F.3d 1265 (D.C. Cir. 2005) ...................................................................... 21

*Fair Emp't Council of Washington, Inc. v. BMC Mktg. Corp.*,
   28 F.3d 1268 (D.C. Cir. 1994) ........................................................................ 12

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
   528 U.S. 167 (2000) ........................................................................................ 10

*Fund Democracy, LLC v. SEC*,
   278 F.3d 21 (D.C. Cir. 2002) .......................................................................... 13

*Gagliardi v. Sullivan*,
   513 F.3d 301 (1st Cir. 2008) ............................................................................ 7

*Garcia v. Vilsack*,
   563 F.3d 519 (D.C. Cir. 2009) ........................................................................ 21

*Gebser v. Lago Vista Indep. Sch. Dist.*,
   524 U.S. 274 (1998) .......................................................................................... 3

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 ..................................................................................................... 26

*Gillis v. HHS*,
  759 F.2d 565 (6th Cir. 1985) .......................................................................... 21

*Habeas Corpus Res. Ctr. v. DOJ*,
  816 F.3d 1241 (9th Cir. 2016) .................................................................. 11, 12

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ............................................................................................ 8

*Hochendoner v. Genzyme Corp.*,
  823 F.3d 724 (1st Cir. 2016) ...................................................................... 7, 11

*Kowalski v. Tesmer*,
  543 U.S. 125 (2004) .................................................................................... 13, 14

*Laird v. Tatum*,
  408 U.S. 1 (1972) ............................................................................................. 14

*Lefkowitz v. Smith Barney, Harris Upham & Co.*,
  804 F.2d 154 (1st Cir. 1986) .......................................................................... 18

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .................................................................................... 8, 14

*Mass. Ass'n of Private Career Schs. v. Healey*,
  159 F. Supp. 3d 173 (D. Mass. 2016) ............................................................ 27

*Mo. Prot. and & Advocacy Servs., Inc. v. Carnahan*,
  499 F.3d 803 (8th Cir. 2007) ..................................................................... 13, 22

*National Mining Ass'n v. McCarthy*,
  758 F.3d 243 (D.C. Cir. 2014) ........................................................................ 23

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*,
  383 F.3d 1047 (D.C. Cir. 2004) ...................................................................... 22

*New Hampshire Right to Life Political Action Comm. v. Gardner*,
  99 F.3d 8 (1st Cir. 1996) ................................................................................ 27

*New York Times v. Sullivan*,
  376 U.S. 254 (19741964) ................................................................................. 26

*Osediacz v. City of Cranston*,
  414 F.3d 136 (1st Cir. 2005) .......................................................................... 14

*Perez v. Mortgage Bankers Ass'n,*
 135 S. Ct. 1199 (2015) ......................................................................................... 23

*Pers. Admin'r of Mass. v. Feeney,*
 442 U.S. 256 (1979) .............................................................................................. 26

*R.I. v. EPA,*
 378 F.3d 19 (1st Cir. 2004) ................................................................................... 17

*Sierra Club v. Morton,*
 405 U.S. 727 (1972) ......................................................................................... 9, 12

*Simon v. E. Ky. Welfare Rights Org.,*
 426 U.S. 26 (1976) .................................................................................................. 9

*Spokeo, Inc. v. Robins,*
 136 S. Ct. 1540 (2016) ....................................................................................... 8, 14

*Steel Co. v. Citizens for Better Env't,*
 523 U.S. 83 (1998) .................................................................................................. 8

*Summers v. Earth Island Inst.,*
 555 U.S. 488 (2009) ......................................................................................... 10, 12

*SurvJustice, Inc. v. DeVos,*
 No. 18-cv-00535-JSC, 2018 WL 477074112 (N.D. Cal. Oct. 1, 2018) ........................... *passim*

*Townsend v. Swank,*
 404 U.S. 282 (1971) .............................................................................................. 30

*Trafalgar Capital Assocs., Inc. v. Cuomo,*
 159 F.3d 21 (1st Cir. 1998) ................................................................................... 18

*Turabo, Inc. v. Feliciano de Melecio,*
 406 F.3d 1 (1st Cir. 2005) ....................................................................................... 7

*Turner v. Sec'y of HUD,*
 449 F.3d 536 (3d Cir. 2006) .................................................................................. 21

*UAW v. Johnson Controls, Inc.,*
 499 U.S. 187 (1991) .............................................................................................. 25

*U.S. Army Corps of Eng'rs v. Hawkes Co.,*
 136 S. Ct. 1807 (2016) ................................................................................ 17, 19, 23

*United Seniors Ass'n, Inc. v. Philip Morris USA,*
 500 F.3d 19 (1st Cir. 2007) ..................................................................................... 7

*Valentin v. Hosp. Bella Vista*,
254 F.3d 358 (1st Cir. 2001) ........................................................................ 7

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) ........................................................................ 8

*Warder v. Shalala*,
149 F.3d 73 ........................................................................ 23

*Warth v. Seldin*,
422 U.S. 490 (1975) ........................................................................ 14

*Wash. Legal Found. v. Alexander*,
984 F.2d 483 (D.C. Cir. 1993) ........................................................................ 21

*Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) ........................................................................ 10, 12, 13

*Whitmore v. Ark.*,
495 U.S. 149 (1990) ........................................................................ 15

*Women's Equity Action League v. Cavazos*,
906 F.2d 742 (D.C. Cir. 1990) ........................................................................ 22, 28

*Zainulabeddin v. United States*,
138 Fed. Cl. 492 (2018) ........................................................................ 20

## Statutes

5 U.S.C. § 553 ........................................................................ 22

5 U.S.C. § 553 ........................................................................ 23

5 U.S.C. § 704 ........................................................................ 17, 20, 29

20 U.S.C. § 1092 ........................................................................ 25

20 U.S.C. § 1098a ........................................................................ 24

20 U.S.C. § 1681 ........................................................................ 2

20 U.S.C. § 1682 ........................................................................ 2, 24

28 U.S.C. § 2201 ........................................................................ 30

## Rules

Federal Rule of Civil Procedure 12(b)(1) ........................................................................ 7, 11

## **Regulations**

34 C.F.R. § 106.8 .................................................................................................................... 4, 24

40 Fed. Reg. 24 ......................................................................................................................... 3

62 Fed. Reg. 12 ......................................................................................................................... 3

# INTRODUCTION

This case is a challenge to a September 2017 guidance document issued by the U.S. Department of Education (ED) Office for Civil Rights (OCR) titled *Q&A on Campus Sexual Misconduct* (2017 Q&A) that "provide[s] information about how OCR will assess a school's compliance with Title IX of the Education Amendments of 1972 (Title IX)."[1] 2017 Q&A at 1, https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf (last visited Nov. 8, 2018). Plaintiffs are two organizations and three pseudonymous individuals who have a policy disagreement with OCR and would prefer that OCR interpret Title IX differently than it does.

This Court should dismiss the case for multiple, independent reasons. At the outset, even after having had an opportunity to amend their complaint, Plaintiffs have failed to meet their burden of demonstrating that they have standing under Article III of the Constitution. The two organizational Plaintiffs, Equal Means Equal (EME) and the National Coalition Against Violent Athletes (NCAVA), allege a mere interest in the policy issues at stake here; they do not show an injury that is cognizable for purposes of Article III. The three individual Plaintiffs, in contrast, are concerned that future courts or administrative officers might rule against them by considering the 2017 Q&A; their claims of future injury are far too speculative to permit recourse to this Court at this time. Because Plaintiffs lack standing, this Court may go no further.

Even if the Court reaches the merits, it should dismiss this case under Rule 12(b)(6). As the only court to consider the question has held, the 2017 Q&A is not final agency action that is reviewable under the Administrative Procedure Act (APA). *See SurvJustice, Inc. v. DeVos*, No. 18-cv-00535-JSC, 2018 WL 4770741, at *11–12 (N.D. Cal. Oct. 1, 2018). That court further

---

[1] The 2017 Q&A accompanied a Dear Colleague Letter (2017 DCL) (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.

dismissed the plaintiffs' arguments that the 2017 Q&A and 2017 DCL (2017 Guidance) are not within ED's regulatory authority and *ultra vires*. *See id.* at *12. That well-reasoned decision is highly persuasive regarding Counts I, II, III, IV, and V of the amended complaint. Count VI is equally infirm: the 2017 Q&A does not regulate speech, so Plaintiffs cannot state a claim for violation of the First Amendment. Count VII fails because Title IX does not create an implied right of action against the federal government in its capacity as regulator. Counts VIII and IX fail because the 2017 Q&A does not violate the Spending Clause, and therefore does not violate the Tenth Amendment. Finally, because the Declaratory Judgment Act does not create an independent cause of action, the Court should dismiss Count X.

For all of these reasons, Defendants respectfully request that the Court grant their motion to dismiss and terminate this case.

## BACKGROUND

### I.         Statutory and Regulatory Background

Title IX provides, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). There are two mechanisms for ensuring compliance. First, individuals injured by discriminatory practices can sue recipients of federal funds directly. *See Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979). Second, ED may "issue[] rules, regulations, or orders of general applicability" to effectuate Title IX. 20 U.S.C. § 1682.

In 1975, ED's predecessor promulgated regulations to effectuate Title IX. *Nondiscrimination on the Basis of Sex in Education Programs and Activities Receiving or*

*Benefiting from Federal Financial Assistance*, 40 Fed. Reg. 24,128 (June 4, 1975).[2] The regulations require each recipient to "adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part." 34 C.F.R. § 106.8(b).

## II.    OCR Guidance Documents

Since the adoption of the aforementioned regulations, OCR, a principal office of ED, has issued a number of guidance documents regarding its enforcement of Title IX. Several of these documents have addressed how Title IX and ED's implementing regulations apply to sexual harassment, which courts have recognized as a form of discrimination proscribed by Title IX. *See, e.g.*, *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 649–50 (1999); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281 (1998).

In 2001, OCR replaced prior guidance on Title IX and sexual harassment by accounting for intervening Supreme Court decisions, including *Davis*, which established that recipients may violate Title IX if they fail to exercise their authority to take remedial action in some cases of student-on-student sexual harassment, including sexual assault. *See Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* (2001 Guidance) i–ii (Jan. 2001), https://www.ed.gov/ocr/docs/shguide.pdf; *Davis*, 526 U.S. at 638–54. Although OCR's focus was on sexual harassment more broadly, the 2001 Guidance contemplated that cases of sexual assault would proceed through schools' Title IX grievance procedures. *See* 2001 Guidance at 16, 21 (specifically addressing schools' responses to allegations of sexual assault); *see also* Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, 62 Fed. Reg. 12,034 12,043, 12,045 (Mar. 13, 1997).

---

[2] HEW's Title IX functions were transferred to ED in 1979, leading to recodification of the regulations. *See N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 516 nn.4–5 (1982).

On April 4, 2011, OCR issued a Dear Colleague Letter (2011 DCL) to "supplement[] the *2001 Guidance* by providing additional guidance and practical examples regarding the Title IX requirements as they relate to sexual violence." 2011 DCL at 2, https://www2.ed.gov/about/ offices/list/ocr/letters/colleague-201104.pdf. The 2011 DCL discussed a recipient's duty to respond to reports of sexual harassment, including sexual violence. The 2011 DCL explained that OCR understood the regulation promulgated at 34 C.F.R. § 106.8(b) to require that schools use a preponderance of the evidence standard in their procedures for resolving Title IX complaints. 2011 DCL at 10–11 & n.26.

On April 29, 2014, OCR issued another guidance document to further clarify ED's understanding of Title IX's requirements. *See Questions and Answers on Title IX and Sexual Violence* (2014 Q&A), https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf (last visited Nov. 8, 2018). That document stated, among other things, that a recipient's grievance procedures must apply a preponderance of the evidence standard in resolving complaints. *Id.* at 13. It also stated that grievance procedures should include "adequate definitions of sexual harassment (which includes sexual violence) and an explanation as to when such conduct creates a hostile environment." *Id.*

On September 22, 2017, OCR issued a DCL that withdrew "the statements of policy and guidance reflected in" the 2011 DCL and the 2014 Q&A. 2017 DCL at 1. And, in order to "provide information about how OCR will assess a school's compliance with Title IX" before ED engages "in rulemaking on the topic of schools' Title IX responsibilities concerning complaints of sexual misconduct," OCR issued the 2017 Q&A at the same time. *Id.*; 2017 Q&A at 1. The portions of the 2017 Q&A that Plaintiffs appear to challenge concern the "procedures [that OCR believes] a school should follow to adjudicate a finding of responsibility for sexual misconduct." 2017 Q&A

4

at 5; Am. Compl. ¶¶ 30–40. In that section, OCR stated that an investigator or decision maker's "findings of fact and conclusions should be reached by applying either a preponderance of the evidence standard or a clear and convincing evidence standard." 2017 Q&A at 5. The 2017 DCL noted that it would "continue to rely" on the 2001 Guidance clarifying that sexual harassment is prohibited by Title IX. 2017 DCL at 2.

### III.       The Parties

Plaintiffs fall into two categories: two organizational plaintiffs (EME and NCAVA) and three pseudonymous individual current and former students (Jane Doe, Mary Doe, and Susan Doe).

#### A.  The Organizational Plaintiffs

EME states that it "is a national 501(c)(4) non-profit organization whose sole purpose is to advocate for sex/gender equality and fully equal rights for women" whose "involvement in this litigation is intended to represent EME in its own right, and the multitude of individuals who have suffered and are at risk of suffering harms based on sex, who will decline to report or seek redress for fear their rights under Title IX will not be fully enforced." Am. Compl. ¶ 48; *see also id.* ¶ 49 (alleging that EME "actively engages in advocacy and educational services related to women's equality under the law"). EME alleges that it has "over twenty-thousand active supporters, a significant percentage of whom are students or others protected by Title IX," and that "Jane Doe and Susan Doe are associated with and supported by EME." *Id.* ¶ 49.

NCAVA states that it is a "national 501(c)(3) non-profit organization . . . whose sole mission is to advocate for the equal treatment of victims of sex-based harms under civil rights laws, such as Title IX, and related laws." *Id.* ¶ 51. It alleges that it "provides legal referrals, counsel and advocacy to victims of sex-based harms, including those victimized by athletes." *Id.*

#### B.  The Individual Plaintiffs

The three individual Plaintiffs are current or former students who filed legal claims against

their schools for alleged violations of their rights that occurred prior to the issuance of the 2017 Q&A. Jane Doe is currently "involved as a complainant in an ongoing Title IX investigation . . . against Stonehill College in Easton, Massachusetts." *Id.* ¶ 60. Her claims "include improper application of the preponderance of evidence rule, use of criminal law standards, and separate, different, and unequal treatment based on sex." *Id.* As set out in the declaration of Adrienne Mundy-Shepard, Jane Doe filed an administrative complaint with OCR prior to the issuance of the 2017 Q&A; that is, she alleges that Stonehill College violated her rights before the 2017 Q&A was issued. To date, Jane Doe's OCR complaint remains open. *See* Mundy-Shephard Decl. ¶ 4.[3]

Mary Doe "is currently involved as a plaintiff in an ongoing lawsuit in Suffolk Superior Court . . . arising out of a sexual assault Doe suffered on campus when she was a student at Boston University." Am. Compl. ¶ 62. State court records reveal that this case was filed on December 8, 2016, prior to the issuance of the 2017 Q&A; that is, she alleges that Boston University violated her rights before the 2017 Q&A was issued. Notably, Mary Doe's complaint against Boston University does not include any claims under Title IX; the only claims are for negligence, breach of contract, and other violations of Massachusetts state law.[4] Her case remains pending.

In May 2018, when Plaintiffs filed the Amended Complaint, Susan Doe was also a

---

[3] This motion is accompanied by declarations from two OCR employees, Adrienne Mundy-Shephard and Karen Mines. The sole purpose of these declarations is to provide background facts concerning the two OCR complaints that are central to Plaintiffs' claims and directly referred to in the Amended Complaint. Those facts are judicially noticeable by this Court. *See, e.g., Benjamin v. Fremont Inv. & Loan*, No. 17-11727, 2018 WL 4017595, at *2 (D. Mass. Aug. 22, 2018).

[4] Records of Suffolk County Superior Court are available at the following location: https://www.masscourts.org/eservices/home.page (choose "Click here to search public records"; then choose Court Department "The Superior Court" and Court Division "Suffolk County Civil"; then search by Case Number 1684CV03765; then click "Doe, Jane"). Although the complaint in her action is not readily available on the Suffolk County court web site, because the action was removed to (and subsequently remanded from) the U.S. District Court for the District of Massachusetts, the complaint is available as an exhibit to the Notice of Removal. *See Doe v. Boston Univ.*, No. 1:17-cv-10520-LTS, ECF No. 1-3 (Mar. 27, 2017).

"complainant in an ongoing Title IX investigation . . . against The School of the Art Institute of Chicago (SAIC) in Chicago, Illinois." *Id.* ¶ 65. Like Jane Doe, she filed her administrative complaint with OCR prior to the issuance of the 2017 Q&A and alleges that SAIC violated her rights before ED issued the 2017 Q&A. *See* Mines Decl. ¶ 2. On June 18, 2018, Susan Doe sued SAIC in federal court. *See Doe v. SAIC*, No. 1:18-cv-04240 (N.D. Ill.). Because the federal lawsuit was based on the same operative facts as the OCR investigation, pursuant to OCR's Case Processing Manual, https://www2.ed.gov/about/offices/list/ocr/docs/ocrcpm.pdf, OCR dismissed Susan Doe's OCR complaint on August 27, 2018. *See* Mines Decl. ¶ 6.

## LEGAL STANDARD

"The proper vehicle for challenging a court's subject-matter jurisdiction," such as whether a plaintiff has standing, "is Federal Rule of Civil Procedure 12(b)(1)." *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 362 (1st Cir. 2001); *see also United Seniors Ass'n, Inc. v. Philip Morris USA*, 500 F.3d 19, 23 (1st Cir. 2007). "[A]t the pleading stage, the plaintiff bears the burden of establishing sufficient factual matter to plausibly demonstrate his standing to bring the action. Neither conclusory assertions nor unfounded speculation can supply the necessary heft." *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 731 (1st Cir. 2016). In considering a Rule 12(b)(1) motion, a court "may consider whatever evidence has been submitted." *Aversa v. United States*, 99 F.3d 1200, 1210 (1st Cir. 1996).

By contrast, the proper vehicle to contest whether a complaint provides "enough facts to state a claim to relief that is plausible on its face" is Rule 12(b)(6). *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Dismissal for failure to state a claim is appropriate if the complaint fails to set forth 'factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory.'" *Gagliardi v. Sullivan*, 513 F.3d

301, 305 (1st Cir. 2008) (quoting *Centro Médico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir.2005)).

## ARGUMENT

The Amended Complaint should be dismissed for a number of reasons. First, because no Plaintiff has standing, the case may go no further: "Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868)). And second, should the Court reach the merits, each of Plaintiffs' claims for relief fails to state a claim on which relief may be granted.

## I.  Plaintiffs Lack Standing.

As a threshold matter, the Court lacks jurisdiction because Plaintiffs have not established that they have standing. To meet this "irreducible constitutional minimum," a plaintiff must show that it "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). The standing inquiry is "especially rigorous" where, as here, "reaching the merits of the dispute would force [the court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Blum v. Holder*, 744 F.3d 790, 797 (1st Cir. 2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013)). The organizational and individual plaintiffs alike lack standing, but for different reasons. They are set forth below.

### A.  EME Lacks Article III Standing.

"In determining whether [an organization] has standing [in its own right, courts] conduct the same inquiry as in the case of an individual: Has the plaintiff '"alleged such a personal stake in the outcome of the controversy" as to warrant his invocation of federal-court jurisdiction'?"

*Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261 (1977)). Despite having been afforded an opportunity to amend its complaint, EME still has not established standing.[5] Most importantly, it has not alleged an injury in fact. At most, EME alleges that numerous individuals have indicated to it that they are unlikely to report "sex-based harms for fear they will not receive equal treatment under Title IX." Am. Compl. ¶ 50. Assuming this to be true, EME does not allege that this is an injury to the organization. Rather, EME has alleged nothing more than "a mere 'interest in'" the 2017 Q&A. *See Sierra Club v. Morton*, 405 U.S. 727, 739 (1972). Such interest, however sincere, is not in enough to establish standing. *See id.* (holding that "a large and long-established organization, with a historic commitment" to protecting the environment, could not establish standing on that basis alone); *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 39–40 (1976) (holding that certain organizations, "which described themselves as dedicated to promoting access of the poor to health services, could not establish their standing simply on the basis of that goal").

To the extent that EME claims to have standing on behalf of its supporters, that argument also fails. "An association has standing to bring suit on behalf of its members when its members

---

[5] Assessing EME's standing is rendered more complicated by the fact that there appear to be two related entities that use that name, and Plaintiffs have not stated which entity has brought this suit. Equal Means Equal, LLC is a California limited liability company that, it appears, is principally responsible for producing and distributing a documentary film titled *Equal Means Equal*. *See* California Business Search, https://businesssearch.sos.ca.gov/ (last visited Sept. 12, 2018) (search by type "LP/LLC Name" and search for "Equal Means Equal"); *see also* Equal Means Equal, http://www.equalmeansequal.com (last visited Nov. 7, 2018). Separately, the Heroica Foundation operates a project called Equal Means Equal, *see* Equal Means Equal, Privacy Policy, http://www.equalmeansequal.org/privacy-policy (last visited Nov. 7, 2018) (describing EqualMeansEqual.org as "owned and operated by the Heroica Foundation"). If Plaintiffs mean to sue on behalf of this project, the proper party is likely the Heroica Foundation. It also bears noting that the purpose of the Heroica Foundation's Equal Means Equal project is to "ensure that ALL people are protected by the Constitution by ratifying the Equal Rights Amendment in just one more state." *See* Equal Means Equal, Fuel the Fight for Equal Rights, https://demand.equalmeansequal.org/page/contribute/default (last visited Nov. 7, 2018).

would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). Crucially, such associational standing is premised on the fact that the organization has *members*. *See id.* However, EME claims to have only "supporters," not actual members. Am. Compl. ¶ 49. And it does not allege that these supporters "possess all of the indicia of membership in an organization." *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977). Indeed, none of the indicia of a membership organization that the Supreme Court has recognized are present here: it does not appear that EME's supporters play any role in selecting its leadership, guiding its activities, or financing those activities. *See Wash. State Apple Advert. Comm'n*, 432 U.S. at 344–45. The D.C. Circuit has held that "supporters" under these circumstances are not "members" sufficient to confer associational standing. *See Am. Legal Found. v. FCC*, 808 F.2d 84, 90 (D.C. Cir. 1987) (holding that an organization lacked standing because its "supporters" lacked these qualities). The Court should hold no differently here.

Furthermore, even if EME's supporters could be construed as members, it has not identified a single member who has standing to sue in his or her own right. "To satisfy [associational standing at the pleading stage], the association must, at the very least, 'identify a member who has suffered the requisite harm.'" *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (Souter, J.) (alterations omitted) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)). Although EME alleges that Jane Doe and Susan Doe are "associated with and supported by EME," Am. Compl. ¶ 49, it does not allege that Jane Doe and Susan Doe are *members* of EME (or facts that would plausibly suggest that they are in fact members). And, for the reasons below, Jane Doe and Susan Doe lack

standing to sue in their own right. Thus, without identifying a single member who has standing to sue in his or her own right, EME lacks standing. *See Draper*, 827 F.3d at 3.

### B. NCAVA Lacks Article III Standing.

Like EME, NCAVA has failed to allege a plausible injury in fact, caused by Defendants, and redressable by this Court. NCAVA believes the 2017 Q&A to be harmful to its clients; it argues that it has become more difficult for "victims [to] receive fully equal and effective redress in the aftermath of sex-based harm," Am. Compl. ¶ 54, and that "victims have expressed an unwillingness to report sex-based harm to campus authorities and law enforcement officials, *id.* ¶ 55. However, at most, these are allegations that the 2017 Q&A harms NCAVA's *clients*, not *NCAVA*. NCAVA has "conflated the question of whether [it] has standing to press claims for injury *on its own behalf* with the question of whether [it] has representative standing to assert claims *on behalf of its members*." *Legal Aid Soc'y of Haw. v. Legal Servs. Corp.*, 145 F.3d 1017, 1030 (9th Cir. 1998) (White, J.). Conclusory assertions to the contrary, *see, e.g.*, Am. Compl. ¶ 55 (alleging without explanation that "[d]eclines in reporting and participation in redress proceedings directly threaten and frustrate NCAVA's mission and purpose"), do not "supply the necessary heft" to defeat a Rule 12(b)(1) motion. *See Hochendoner*, 823 F.3d at 731.

Properly framed, NCAVA's alleged injuries are not in fact injurious to it at all. "Assisting and counseling clients in the face of legal uncertainty is the *role* of lawyers, and, notably, [Plaintiffs] have not cited any authority suggesting that lawyers suffer a legally cognizable injury in fact when they take measures to protect their clients' rights or alter their litigation strategy amid legal uncertainty." *Habeas Corpus Res. Ctr. v. DOJ*, 816 F.3d 1241, 1250 (9th Cir. 2016). NCAVA cannot claim that assisting its clients is an organizational injury when its "sole mission is to advocate for the equal treatment of victims of sex-based harms under civil rights laws," Am. Compl. ¶ 51. "Taken to its logical conclusion, this theory of injury would permit attorneys to

challenge any governmental action or regulation when doing so would make the scope of their clients' rights clearer and their strategies to vindicate those rights more easily selected." *Habeas Corpus Res. Ctr.*, 816 F.3d at 1250. Of course, this theory is not the law; permitting a plaintiff to challenge a "regulation in the abstract . . . would fly in the face of Article III's injury-in-fact requirement." *Summers*, 555 U.S. at 494.

The only other alleged injuries to NCAVA are that it has diverted resources "to combat the harmful effects of the [2017 Q&A]." Am. Compl. ¶ 54. But because (as set out above) the 2017 Q&A does not actually injure NCAVA (as opposed to its clients), NCAVA's voluntary choice to expend resources in response to the 2017 Q&A cannot create standing. Organizations cannot obviate Article III's injury in fact requirement by declaring an interest in a policy and spending resources to combat it. *See Fair Emp't Council of Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276–77 (D.C. Cir. 1994). Indeed, "if any group with a bona fide 'special interest' could initiate such litigation, it is difficult to perceive why any individual citizen with the same bona fide special interest would not also be entitled to do so." *Sierra Club*, 405 U.S. at 739–40; *cf. Amnesty Int'l USA*, 568 U.S. at 416 ("If the law were otherwise, an enterprising plaintiff would be able to secure a lower standard for Article III standing simply by making an expenditure based on a nonparanoid fear.").

Further, the Court should reject any suggestion that NCAVA has standing on behalf of its clients. As discussed above, a membership association may have standing on behalf of individuals who "possess all of the indicia of membership in an organization." *Wash. State Apple Advert. Comm'n*, 432 U.S. at 344. Yet NCAVA, like EME, has not plausibly alleged that it is a membership association. At most, it has alleged that it has *clients* who are affected by the 2017 Q&A. *See* Am. Compl. ¶¶ 56–59. But it does not allege that these clients are *members* of NCAVA

12

or that they "possess all of the indicia of membership in an organization," *see Wash. State Apple Advert. Comm'n*, 432 U.S. at 344. Numerous courts of appeals have held that under similar circumstances, "clients" are not "members" that would satisfy the first requirement of associational standing. *See Mo. Prot. & Advocacy Servs., Inc. v. Carnahan*, 499 F.3d 803, 809–10 (8th Cir. 2007) (holding that an organization lacked associational standing on behalf of its clients because they were not members); *Ass'n for Retarded Citizens of Dall. v. Dall. Cty. Mental Health & Mental Retardation Ctr. Bd. of Trs.*, 19 F.3d 241, 244 (5th Cir. 1994) (same); *see also Fund Democracy, LLC v. SEC*, 278 F.3d 21, 25 (D.C. Cir. 2002) (holding that an organization that claimed to "represent[] an 'informal consortium' of various groups" lacked associational standing because "these groups [were not] the equivalent of members"). Without any indication that NCAVA's clients are different from the clients in these cases, this Court should not deviate from these decisions.

Finally, even if its clients could be considered members, NCAVA cannot claim to have associational standing because it has not identified any members who have standing to sue in their own right. It claims that "Jane Doe and Susan Doe are associated with and supported by NCAVA," Am. Compl. ¶ 59, but it does not allege that these individuals are members or bear all the indicia of membership. And, as discussed below, Jane Doe and Susan Doe lack standing in their own right. Without identifying a single member who has standing to sue in their own right, NCAVA lacks standing on this basis alone. *See Draper*, 827 F.3d at 3.

## C. The Organizational Plaintiffs Lack Standing to Bring Their First Amendment Claim.

Finally, EME and NCAVA lack standing to bring their First Amendment claim because they do not allege that their speech has been chilled. A party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third

parties." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). Despite this general principle, EME and NCAVA attempt to rest their First Amendment claims on the legal rights of third parties (i.e., students), whose speech the 2017 Q&A allegedly chills. *See* Am. Compl. ¶ 48 (claiming "to represent . . . the multitude of individuals . . . who will decline to report or seek redress for fear their rights under Title IX will not be fully enforced"); *id.* ¶ 55 (claiming that "[d]eclines in reporting and participation in redress proceedings directly threaten and frustrate NCAVA's mission and purpose"). EME and NCAVA do not claim that *their* speech has been chilled. Because they "themselves are not chilled, but seek only to represent those 'millions' whom they believe are so chilled, respondents clearly lack that 'personal stake in the outcome of the controversy' essential to standing." *Laird v. Tatum*, 408 U.S. 1, 13 n.7 (1972) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)); *see also Osediacz v. City of Cranston*, 414 F.3d 136, 142 (1st Cir. 2005) (holding that the plaintiff lacked standing on her First Amendment claim because "[h]er only claim of injury is that, as a resident and taxpayer, she is subject to the effects of the [challenged] Policy [which] has a chilling effect on the speech of others"). In fact, EME and NCAVA do not even invoke third party standing as a basis for jurisdiction on this claim. *See Kowalski*, 543 U.S. at 130 (articulating the elements of third party standing).

### D.  The Individual Plaintiffs Lack Standing.

Because the individual plaintiffs have not plausibly alleged an injury in fact that is caused by Defendants and redressable by the Court, they lack standing as well. "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc.*, 136 S. Ct. at 1548 (quoting *Defs. of Wildlife*, 504 U.S. at 560). The Supreme Court has "repeatedly reiterated that 'threatened injury must be certainly impending to constitute injury in

fact,' and that 'allegations of possible future injury' are not sufficient." *Amnesty Int'l USA*, 568 U.S. at 409 (alterations omitted) (quoting *Whitmore v. Ark.*, 495 U.S. 149, 158 (1990)).

Jane Doe, Mary Doe, and Susan Doe each have pending cases before different forums: Jane Doe's case against Stonehill College is pending before OCR; Mary Doe's case against Boston University is pending in Suffolk County Superior Court; and Susan Doe's case against SAIC is now pending before the United States District Court for the Northern District of Illinois. As set out above, none of these individuals is contending that the 2017 Q&A has influenced any action that has *already* been taken; each case alleges that the school in question violated her rights *before* the 2017 Q&A was issued. Specifically, each individual Plaintiff's concern is that the forum in which she is pursuing claims against her school might find in the future that the school complied with Title IX if that forum places undue weight upon the 2017 Q&A. *See* Am. Compl. ¶ 61 (Jane Doe concerned that 2017 Q&A will be "applied in her case" before OCR); *id.* ¶ 64 (Mary Doe concerned that "courts in Title IX lawsuits have already accepted the [2017 Q&A] as relevant and admissible"); *id.* ¶ 66 (Susan Doe, concerned OCR "would be using the [2017 Q&A] to evaluate her case," which is now dismissed).

Because these cases are all pending, Plaintiffs' fears of future injury are entirely speculative. *See Cohn v. Brown*, 161 F. App'x 450, 455 (6th Cir. 2005) (holding that an alleged injury from a pending case was speculative). Speculation about future injury cannot provide the basis for standing now. *See, e.g.*, *Amnesty Int'l USA*, 568 U.S. at 409. Of course, if any of the individual Plaintiffs are aggrieved by the decisions ultimately reached in their cases, the appropriate remedy is to pursue all lawful appeals of or challenges to those decisions. *See generally infra* Part II.B (explaining that Plaintiffs' APA claims fail because they possess an adequate alternative remedy). Insofar as Mary Doe's lawsuit against Suffolk County does not even include

claims under Title IX, her speculation that the 2017 Q&A might affect the disposition of her case is especially remote. Plaintiffs' attempt to leverage their pending litigation in other forums into an Article III injury here represents an inappropriate collateral attack on those pending cases.

It is impossible for Defendants to have caused an injury when none occurred in the first place. The only individual Plaintiff to have received any sort of determination from Defendants is Susan Doe, whose administrative complaint was dismissed pursuant to OCR's Case Processing Manual because she filed a case raising "[t]he same or a similar allegation based on the same operative facts" in federal court, *see* Case Processing Manual § 108(h). *See* Mines Decl. ¶ 6. Because OCR did not determine whether SAIC complied with Title IX, it did not consider the 2017 Q&A. *See id.* Therefore, the 2017 Q&A was irrelevant to OCR's dismissal. It did not cause her alleged injury. It is equally implausible that the 2017 Q&A caused any injury to Jane and Mary Doe's cases because nothing has been decided in those cases. *See supra* Background. While the 2017 Q&A may influence OCR's resolution of Jane Doe's case, *see* Am. Compl. ¶ 61, her case is still pending. And as discussed below, if she is dissatisfied with OCR's resolution of her case, she may assert whatever rights she has at that point. *See infra* Part II.B.

Finally, Plaintiffs' feared future injury is not redressable by this Court. Even if this Court were to grant Plaintiffs the relief they seek, there is no guarantee that the forums in which they are pursuing litigation would interpret Title IX as they propose or rule in their favor. Courts have expressed particular reluctance "to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Amnesty Int'l USA*, 568 U.S. at 413; *see also COPE v. Kan. State Bd. of Educ.*, 821 F.3d 1215, 1223 n.11 (10th Cir. 2016) (holding that a challenge to a state Board's educational Standards would not redress plaintiffs' injury because "schools may incorporate the Standards . . . regardless of whether the Board has officially adopted

them)." The Court should be no less reluctant here.

II.     **The Court Should Dismiss Counts I through V Because Plaintiffs Do Not Challenge Final Agency Action and Because Plaintiffs Have an Adequate Alternative Remedy in a Court.**

Should the Court reject the foregoing arguments and determine that Plaintiffs have standing, it should still dismiss Plaintiffs' claims pursuant to Rule 12(b)(6). At the outset, the Court should dismiss Counts I through V, all of which arise under the APA. Under the APA, Plaintiffs may only challenge "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704 (2012). Because the 2017 Q&A is not made reviewable by statute, Plaintiffs may only proceed under the APA if (1) the 2017 Q&A is final agency action, *and* (2) they lack another adequate remedy in a court. Neither condition is present here.

A.  **The 2017 Q&A Is Not Final Agency Action.**

At the outset, as the only court to consider the question has held, the 2017 Q&A is not final agency action. *See SurvJustice, Inc.*, 2018 WL 4770741. Two conditions comprise a "final agency action": "First, the action must mark the consummation of the agency's decisionmaking process— it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).

Under the second prong of this test, agency action is final "only where it 'represents the culmination of the agency's decisionmaking process and conclusively determines the rights and obligations of the parties with respect to the matters at issue.'" *Berkshire Envt'l Action Team, Inc. v. Tenn. Gas Pipeline Co., LLC*, 851 F.3d 105, 111 (1st Cir. 2017) (quoting *Rhode Island v. EPA*, 378 F.3d 19, 23 (1st Cir. 2004)). Actions must have "direct and immediate" consequences.

*Trafalgar Capital Assocs. v. Cuomo*, 159 F.3d 21, 35 (1st Cir. 1998). Opinion letters that have "no direct or immediate impact on the parties" are not final agency action, *Assoc. of Int'l Auto Mfrs. v. Comm'r, Mass. Dep't of Env'tl Prot.*, 208 F.3d 1, 5 (1st Cir. 2000), nor are guidance documents that simply state the agency's view of what the law requires, *see Ass'n of Flight Attendants-CWA v. Huerta*, 785 F.3d 710, 714 (D.C. Cir. 2015) ("The Notice merely provides guidance to aviation safety inspectors who enforce FAA regulations. Moreover, [the] Notice creates no rights or obligations, and generates no legal consequences."); *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 808 (D.C. Cir. 2006) ("There is no doubt that the guidelines reflect NHTSA's views on the legality of regional recalls. But this does not change the character of the guidelines from a policy statement to a binding rule.").

The Amended Complaint nowhere actually alleges that the 2017 Q&A is final agency action, which is reason enough to dismiss Plaintiffs' APA claims. *See, e.g.*, *Lefkowitz v. Smith Barney, Harris Upham & Co.*, 804 F.2d 154, 156 (1st Cir. 1986) (claim should be dismissed where plaintiff "failed properly to plead an essential element"); *Cabacoff v. Willis*, No. 16-11990-WGY, 2016 WL 7018522, at *1 (D. Mass. Nov. 30, 2016) (similar). But even if Plaintiffs had alleged that the 2017 Q&A is final agency action, such an allegation would fail as a matter of law. As explained above, the 2017 Q&A "does not add requirements to applicable law." 2017 Q&A at 7. Instead, the 2017 Q&A merely "provide[s] information about how OCR will assess a school's compliance with Title IX." 2017 Q&A at 1. As in *Association of Flight Attendants-CWA*, "no [recipient] need alter any policy in response to [them]." 785 F.3d at 714. No matter what the 2017 Q&A says, investigations into a school's compliance with Title IX will rise and fall with the statute and its governing regulations, not the 2017 DCL and Q&A. *See id.*

As noted above, the only court to consider this question has held that the 2017 Guidance is

not final agency action. In *SurvJustice*, the district court dismissed with prejudice all APA claims challenging the 2017 Guidance and explained that it "does not satisfy the second *Bennett* prong." 2018 WL 4770741, at *10. As the court explained, "legal consequences continue to flow only from a school's noncompliance with Title IX and its implementing regulations," as "the guidance merely provides 'information' for schools regarding how the Department's Office [for] Civil Rights will assess compliance with *those* existing laws." *Id.* "Therefore, if a school is in compliance with Title IX and its regulations, it need not change its policies in response to the 2017 Guidance." *Id.* Although the *SurvJustice* plaintiffs alleged that some schools had voluntarily changed their policies in light of the 2017 Guidance, the court explained that "voluntarily changing a policy in response to an agency's nonbinding enforcement guidance is not the same as being required to do so by the guidance itself." *Id.* "Simply put, if a school disagreed with the 2017 Guidance and chose not to follow it, it would suffer no legal consequences as long as it continued to comply with Title IX and its implementing regulations." *Id.* That analysis is correct and disposes of all APA claims in this case.[6]

### B. Plaintiffs Have an Adequate Alternative Remedy.

Even if the 2017 Q&A were final agency action, dismissal of Plaintiffs' APA claims under 5 U.S.C. § 704 would still be proper because Plaintiffs have an adequate alternative remedy in a

---

[6] At the time that the *SurvJustice* court held that the 2017 Guidance is not final agency action, two of the Plaintiffs here—EME and NCAVA—had a pending motion to intervene as plaintiffs in that case, and they had also filed an earlier amicus brief. *See SurvJustice*, ECF Nos. 47, 71. Their proposed complaint in intervention included a variety of APA claims similar to those that they assert in this case. *See id.* Three days after the *SurvJustice* Court held that the 2017 Guidance is not final agency action, EME and NCAVA withdrew their motion to intervene in an apparent effort to avoid being bound by that ruling. *See SurvJustice*, ECF No. 82. While EME and NCAVA may not be formally bound by the *SurvJustice* ruling, insofar as they never technically became parties to the *SurvJustice* case, it remains inappropriate for them to be simultaneously seeking two opportunities to invalidate the same guidance in courts on two coasts. If nothing else, the fact that EME and NCAVA had an opportunity to be heard in the *SurvJustice* case is even more reason for the Court to place significant weight upon Judge Corley's lengthy and considered opinion.

court. That is true as to both the individual Plaintiffs (all of whom are currently seeking alternative remedies), and the organizational Plaintiffs (who would be free to seek such remedies if they had standing to challenge the 2017 Q&A).

### 1. The Individual Plaintiffs Have an Adequate Alternative Remedy.

At the outset, the three individual Plaintiffs have adequate alternative remedies in a court. As discussed above, Jane Doe, Mary Doe, and Susan Doe each allege that she was sexually assaulted and that her school failed to take appropriate action in response. The individual Plaintiffs are now each seeking, in various forums, a remedy against their schools: Jane Doe filed a Title IX complaint against Stonehill College with OCR, *see* Am. Compl. ¶ 60; Mary Doe sued Boston College in Massachusetts state court, *see id.* ¶ 62; and Susan Doe filed a complaint against SAIC with OCR, *see id.* ¶ 65, though she has since filed a federal lawsuit, resulting in the dismissal of that OCR complaint*, see* Mines Decl. ¶¶ 5–6. Each individual Plaintiff's concern is that the forum in which she is pursuing claims against her school might rule against her if that forum places undue weight upon the 2017 Q&A. *See* Am. Compl. ¶ 61 (Jane Doe concerned that 2017 Guidance will be "applied in her case" before OCR); *id.* ¶ 64 (Mary Doe concerned that "courts in Title IX lawsuits have already accepted the [2017 Q&A] as relevant and admissible"); *id.* ¶ 65 (Susan Doe concerned OCR "would be using the [2017 Q&A] to evaluate her case," which is now dismissed).

Each of these individuals has an adequate alternative remedy in a court. Mary Doe and Susan Doe are *currently* seeking such remedies in court; they may each argue to the courts hearing their cases that the court should place little weight upon the 2017 Q&A for all the reasons that they are asserting in this case. While Jane Doe's case is still before OCR, if OCR rejects her claims and dismisses her complaint, Jane Doe could avail herself of all legal claims that are available to her.

Because the individual Plaintiffs possess an adequate alternative remedy, their APA claims must be dismissed. *See, e.g.*, *Turner v. Sec'y of HUD*, 449 F.3d 536, 539–41 (3d Cir. 2006) (private

right of action against landlord under the Fair Housing Act precluded an APA challenge to HUD's processing of the plaintiff's discrimination complaint); *Wash. Legal Found. v. Alexander*, 984 F.2d 483, 484, 486 (D.C. Cir. 1993) (private right of action against schools under Title VI of the Civil Rights Act of 1964 precluded a suit under the APA seeking to compel ED to adopt and enforce regulations prohibiting schools from offering scholarships only to minority students); *Gillis v. HHS*, 759 F.2d 565, 575–78 (6th Cir. 1985) (private right of action against hospitals to enforce the Hill-Burton Act precluded an APA challenge to an agency's alleged failure to monitor and enforce hospitals' compliance); *Am. Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 62 (1st Cir. 1978).

### 2.  The Organizational Plaintiffs Have an Adequate Alternative Remedy.

The organizational Plaintiffs also have an adequate alternative remedy. If the Court concludes that the organizational Plaintiffs have standing to challenge the 2017 Q&A at all, any injury arises only where a school is actually considering the 2017 Q&A in investigating a report of sexual assault. *See, e.g.*, Am. Compl. ¶ 53 (NCAVA alleges injury because schools modified their Title IX practices in reliance on 2017 Q&A). If such an injury is cognizable for standing purposes, then the appropriate remedy is to sue the school that has caused the injury.

The heart of the organizational Plaintiffs' claim is that the 2017 Q&A will lead those subject to ED's regulation—schools—to violate Title IX. But while Plaintiffs would prefer to sue the regulator for what they believe is inadequate regulation, "a private cause of action against a third party otherwise subject to agency regulation" constitutes an adequate alternative remedy. *Garcia v. Vilsack*, 563 F.3d 519, 523 (D.C. Cir. 2009) (quoting *El Rio Santa Cruz Neighborhood Health Ctr. v. HHS*, 396 F.3d 1265, 1271 (D.C. Cir. 2005)). Such suits provide an adequate alternative remedy even if "individual actions against discriminators cannot redress the systemic lags and lapses by federal monitors about which they complain." *Women's Equity Action League v. Cavazos*, 906 F.2d 742, 751 (D.C. Cir. 1990). "Suits directly against the discriminating entities

may be more arduous, and less effective in providing systemic relief, than continuing judicial oversight of federal government enforcement." *Id.* "But under our precedent, situation-specific litigation affords an adequate, even if imperfect, remedy." *Id.*

The D.C. Circuit's decision in *National Wrestling Coaches Association v. ED* is instructive. 383 F.3d 1047 (D.C. Cir. 2004). The plaintiffs in that case sought to challenge a DCL in which OCR clarified its interpretation of Title IX and ED regulations as they applied to intercollegiate athletics, alleging that OCR's policies caused schools to eliminate or cut their men's wrestling programs. *See id.* at 933–36. The panel held that "the availability of a private cause of action directly against universities that discriminate in violation of Title IX" constituted an adequate remedy that barred the plaintiffs' APA claim against ED. *Id.* at 945–48. The panel's holding was later endorsed by seven judges in a *per curiam* statement concerning the denial of rehearing *en banc*. *See Nat'l Wrestling Coaches Ass'n*, 383 F.3d at 1048.

Just as in these cases, Plaintiffs here are concerned that schools will act inconsistently with Title IX because ED is not doing a good enough job of regulating them. As the precedent discussed above teaches, should Plaintiffs' fears come to pass, the appropriate response is lawsuits against the schools that Plaintiffs believe are violating the law and thereby injuring them.

## III. The Court Should Dismiss Count I Because Defendants Did Not Exceed Their Statutory Authority.

The Court should dismiss Count I because Defendants did not exceed their statutory authority in issuing the 2017 Q&A. As Plaintiffs recognize, Am. Compl. ¶ 77, ED "is authorized and directed to effectuate the provisions of [Title IX] by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken." 20 U.S.C. § 1682. To effectuate Title IX, ED's predecessor promulgated 34 C.F.R. § 106.8(b), which

requires each recipient to "adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part." Neither Title IX nor § 106.8(b) address the burden of proof these procedures should use. Nor do they dictate that sexual misconduct claims must be treated in the same manner as other misconduct claims. Yet, in determining whether a recipient complies with Title IX, ED must on occasion decide these questions. The 2017 Q&A does nothing more than inform the public how ED would answer some of them. Thus, it is eminently within the agency's jurisdiction. *See SurvJustice*, 2018 WL 4770741, at *12 (dismissing with prejudice claim that the 2017 Guidance was *ultra vires* in light of "the absence of plausible allegations that Defendants acted outside their legal authority in issuing the 2017 Guidance").

Finally, Plaintiffs' argument regarding the Clery Act misrepresents the 2017 Q&A and the Clery Act. The 2017 Q&A does not "require the use of criminal law definitions to assess whether a civil rights offense under Title IX has occurred," Am. Compl. ¶ 82. To begin with, the guidance requires nothing. Furthermore, the document offers no guidance on how to define any terms regarding sexual misconduct. Plaintiffs appear to believe that the answer to question 2, 2017 Q&A at 2, which explains the Clery Act, 20 U.S.C. § 1092 (2012), implicitly incorporates its definitions section, *id.* § 1092(f)(7), into Title IX. It does no such thing; the guidance simply reminds recipients that they have reporting obligations under the Clery Act, an unequivocal requirement of the statute, *see id.* § 1092(f)(1) (applying the statute to "[e]ach eligible institution participating in any program under this subchapter").

## IV.     The Court Should Dismiss Count II Because the 2017 Q&A Is Not a Legislative Rule.

The Court should also dismiss Count II, which principally alleges that the 2017 Q&A was promulgated without following the notice and comment requirements of 5 U.S.C. § 553. The Court

should dismiss that claim because the 2017 Q&A is a "general statement[] of policy" that is exempt from the APA's notice-and-comment requirements. *See* 5 U.S.C. § 553(b).

Section 553 applies to legislative rules, which "have the 'force and effect of law.'" *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302-03 (1979)). A "rule with the force and effect of law—binding not only on the agency and regulated parties, but also the courts—is by definition a substantive [i.e., legislative] rule." *Warder v. Shalala,* 149 F.3d 73, 82 (1st Cir. 1998). Legislative rules stand in contrast to general statements of policy, which are "statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Chrysler Corp.*, 441 U.S. at 302 n.31 (quoting Attorney General's Manual on the APA (1947)). "An agency action that merely explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule—is a general statement of policy." *National Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014). It serves to "appris[e] the regulated community of the agency's intentions" and "inform[] the exercise of discretion by agents and officers in the field." *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 949 (D.C. Cir. 1987).

The 2017 Q&A is not a legislative rule. While a legislative rule has the force of law, *see, e.g.*, *Warder*, 149 F.3d at 81–82, the 2017 Q&A does not add requirements to applicable law. "As always," the accompanying DCL indicates, "the Department's enforcement efforts proceed from Title IX itself and its implementing regulations." 2017 DCL at 2. The sole purpose of the Q&A is to "provide information about how OCR will assess a school's compliance with Title IX" itself. *See* 2017 Q&A at 1; *see also SurvJustice*, 2018 WL 4770741, at *10 (2017 Guidance does not

"create[] new obligations"). The 2017 Q&A is a guidance document, not a legislative rule.[7]

**V.      The Court Should Dismiss Counts IV and VII Because the 2017 Q&A Does Not Discriminate on the Basis of Sex.**

Plaintiffs' allegation that the 2017 Q&A violates the APA and Title IX because it is facially discriminatory and will cause discriminatory effects, *see* Am. Compl. ¶¶ 107, 119–29, fails as a matter of law. A policy is facially discriminatory when the plain text is discriminatory. *See, e.g.*, *UAW v. Johnson Controls, Inc.*, 499 U.S. 187 (1991). This is not the case here; the plain text of the 2017 Q&A treats individuals of all sexes the same. Plaintiffs argue that the 2017 Q&A violates Title IX because it "subject[s] sex-based civil rights harms to separate and different treatment." Am. Compl. ¶ 30. Yet a policy is not facially discriminatory if it treats sex discrimination differently than race discrimination. In support of this proposition, one need look no further than the Equal Protection Clause, which treats claims of discrimination on the basis of sex differently from claims of discrimination on the basis of race. That clause requires strict scrutiny of laws that discriminate on the basis of race and intermediate scrutiny of laws that discriminate on the basis of sex. *See, e.g.*, *Clark v. Jeter*, 486 U.S. 456, 461 (1988). It does not follow that the Constitution discriminates on the basis of sex: sex discrimination is treating an individual differently because of their sex, not treating *alleged discrimination on the basis of sex* differently from *alleged*

---

[7] Plaintiffs' claim under 20 U.S.C. § 1098a, *see* Am. Compl. ¶ 91, fails for this and other reasons. Under that provision, "[t]he Secretary shall obtain public involvement in the development of proposed regulations for this subchapter." 20 U.S.C. § 1098a(a)(1). At the outset, for the reasons stated above, the 2017 Q&A is not a "regulation." In addition, the "subchapter" referred to in the provision is Title 20, Chapter 28, Subchapter IV, which governs "Student Assistance" under the Higher Education Act, not Title IX. *See, e.g.*, *Bauer v. DeVos*, 325 F. Supp. 3d 74, 80 (D.D.C. 2018) (observing that negotiated rulemaking under 20 U.S.C. § 2081a was "pursuant to [ED's] obligations under the HEA [Higher Education Act]"); *Castagnola v. Educ. Credit Mgmt. Corp.*, No. 2:11-cv-688, 2013 WL 3288165, at *3 (S.D. Ohio June 28, 2013) (noting that 20 U.S.C. § 1098a applies to "regulations implementing the HEA"). Yet, the 2017 Q&A construes Title IX, not the HEA. Thus, even if the 2017 Guidance were considered a regulation, 20 U.S.C. § 1098a has no application here.

*discrimination on the basis of race*.

Plaintiffs have also not plausibly alleged that the 2017 Q&A is invalid because it "will cause discriminatory effects," Am. Compl. ¶ 127. A facially neutral policy causing an alleged disparate impact "is unconstitutional . . . *only* if [a disparate] impact can be traced to a discriminatory *purpose*." *Pers. Admin'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979) (emphasis added). But the Amended Complaint is devoid of any allegations that Defendants issued the 2017 Q&A with discriminatory intent. Therefore, the Court should dismiss Counts IV and VII.

### VI.      The Court Should Dismiss Count VI Because The 2017 Q&A Does Not Regulate Speech.

The Court should further dismiss Count VI, which contends that the 2017 Q&A "chill[s] Plaintiffs' First Amendment rights by deterring victims of sex-based civil rights harms from reporting and seeking redress." Am. Compl. ¶ 116. Plaintiffs' theory is that in light of the 2017 Q&A, certain individuals will be less likely to report alleged sexual assaults because they will be less confident of prevailing.

While the Supreme Court has recognized a "chill" theory under the First Amendment, that theory applies where the government's regulation of unprotected speech risks deterring speakers from engaging in protected speech. For example, false factual statements are generally not protected by the First Amendment, but the Supreme Court has held that such statements must receive "a measure of strategic protection" to ensure that regulation of such statements does not unduly inhibit protected speech. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974); *see also, e.g.*, *New York Times v. Sullivan*, 376 U.S. 254, 279 (1964) (were false statements on matters of public concern necessarily subject to unlimited libel judgments, "would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the

expense of having to do so"). To even demonstrate standing on a theory of this kind, a plaintiff must have an objectively reasonable belief that he or she will be subject to the law. *See, e.g.*, *N.H. Right to Life Political Action Comm. v. Gardner*, 99 F.3d 8, 14 (1st Cir. 1996) ("A party's subjective fear that she may be prosecuted for engaging in expressive activity will not be held to constitute an injury for standing purposes unless that fear is objectively reasonable.").[8]

Plaintiffs do not allege that the government is regulating unprotected speech in a way that may chill Plaintiffs' exercise of their protected speech rights; indeed, the government is not regulating any speech at all. Plaintiffs are instead alleging that because the government has issued certain guidance, some people will elect not to exercise their First Amendment rights. Defendants are unaware of any case that has even contemplated the possibility of a First Amendment violation in analogous circumstances. *See Mass. Ass'n of Private Career Sch. v. Healey*, 159 F. Supp. 3d 173, 213 (D. Mass. 2016) (rejecting chilling argument where the challenged "regulations do not appear to silence, restrict, or otherwise limit any speech at all"). Indeed, no other result would make sense: legislatures routinely modify the law in ways that make people less likely to file actions: legislatures might raise burdens of proof, cap permissible damages, or even eliminate causes of action entirely. If Plaintiffs' theory were right, any of these actions could violate the First Amendment by removing an incentive to pursue legal claims. That cannot be and is not the law.

**VII.      The Court Should Dismiss Count VII Because Title IX Does Not Create a Cause of Action against the Federal Government in Its Capacity as Regulator.**

In addition, the Court should dismiss Count VII, which is brought directly under Title IX. While Title IX creates an implied private right of action against recipients of federal funding that

---

[8] Courts have also recognized that if the government retaliates against a speaker, such retaliation may cause a chilling effect that implicates First Amendment rights. *See, e.g.*, *Barton v. Clancy*, 632 F. 3d 9 (1st Cir. 2011). That theory has no application here, where Plaintiffs do not allege that they were retaliated against for the content of their speech.

are deliberately indifferent to sexual harassment, *see, e.g.*, *Gebser*, 524 U.S. at 284, that implied private right of action is not implicated in this case, which exclusively challenges the federal government in its capacity as regulator. Plaintiffs must therefore bring their claims under the APA, to the extent that relief is available, or not at all.

The First Circuit has reached precisely this holding with respect to the Rehabilitation Act. *See Cousins v. Sec'y of the U.S. Dep't of Transp.*, 880 F.2d 603 (1st Cir. 1989) (en banc) (Breyer, J.). As then-Judge Breyer explained for the *en banc* court, "the APA was intended to organize and unify preexisting methods of obtaining judicial review of agency action." *Id.* at 605. Thus, even though the "Rehabilitation Act does expressly provide for private enforcement actions against" discriminatory recipients of federal funding, challenges to the government's actions in its capacity as regulator had to be brought under the APA. *See id.* ("[G]iven the vast number of federal laws, government agencies, and potential legal disputes, it makes sense to try to maintain a clear, orderly procedural way for injured persons to bring their claims against federal agencies before the courts. The APA was intended to provide just such a single uniform method for review of agency action."). As the First Circuit explained, "in light of the existence of the APA, it rarely makes sense to find that a substantive statute creates an 'implied private right of action' against the federal government for relief from unlawful regulatory action." *Id.* at 606. Because Title IX, Section 504, and Title VI contain parallel language, the same analytic framework should generally apply in cases under all three statutes. *See Alexander v. Choate*, 469 US 287, 293 n. 7 (1985). Indeed, the D.C. Circuit has reached a similar holding to *Cousins* under Title IX, holding that there is no implied right of action against the federal government in its capacity as regulator. *See Women's Equity Action League v. Cavazos*, 906 F.2d 742, 748-750 (D.C. Cir. 1990) (Ginsburg, R.B., J.).

To be sure, Plaintiffs here do not satisfy the standards for APA relief. *See supra* Part II.

That they are attempting to challenge a nonfinal action that is not reviewable under the APA, however, does not mean they are free to litigate directly under Title IX. It instead means that Congress did not intend judicial review of interim, non-binding statements of agency opinion of the kind at issue here, and that they must wait to litigate APA claims until such time as there is a final agency action for them to challenge. *See Cousins*, 880 F.2d at 610 (holding that the plaintiff must litigate under the APA even though "the record-building procedures may differ under the APA, a difference that reflects the legal principle of permitting agencies to deal thoroughly in the first instance with issues like the present one").[9]

### VIII. The Court Should Dismiss Counts VIII And IX Because The 2017 *Q&A* Violates Neither The Spending Clause Nor The Tenth Amendment.

The Court should further dismiss Counts VIII and IX, which raise claims under the Tenth Amendment and Spending Clause, respectively. Those claims are largely duplicative insofar as the Tenth Amendment claim contends that Congress and ED lack the constitutional authority to issue the 2017 Q&A. *See, e.g.*, Compl. ¶¶ 134–35. Because Title IX was validly enacted pursuant to Congress's Spending Clause authority, the Spending Clause claim and Tenth Amendment claim fail for the same reason.

Title IX was adopted pursuant to Congress's Spending Clause power. *See, e.g.*, *Davis*, 526 U.S. at 640 (noting that "we have repeatedly treated Title IX as legislation enacted pursuant to Congress' authority under the Spending Clause"). It therefore appears to be Plaintiffs' argument not that Title IX itself is unconstitutional, but that the 2017 Q&A is. Their essential argument is that the 2017 Q&A "intrude[s] excessively into the power of the states or unlawfully coerce[s]"

---

[9] Should the Court reject this argument and conclude that Plaintiffs may in fact sue the federal government directly under Title IX, that would provide further support for the proposition that Plaintiffs' APA claims must be dismissed, insofar as their Title IX claims would provide an adequate alternative remedy under 5 U.S.C. § 704.

Massachusetts funding recipients by forcing them to violate the law by treating sex-based harms differently as a condition of receiving federal funds. Am. Compl. ¶ 138. That argument fails for the simple reason that the 2017 Q&A does not force anyone to do anything; as the *SurvJustice* court recognized, "if a school is in compliance with Title IX and its regulations, it need not change its policies in response to the 2017 Guidance." *SurvJustice*, 2018 WL 4770741, at *10. Moreover, a school following the 2017 Q&A would not violate Massachusetts law; under the Guidance, claims by individuals of all sexes are treated identically and there is no discrimination on the basis of sex. *See supra* Part V. Finally, even if the 2017 *Q&A* compelled schools to take action in violation of state law, under the Supremacy Clause, the federal action would prevail. *See, e.g. Townsend v. Swank*, 404 U.S. 282 (1971) (holding a state law invalid due to conflict with federal spending clause legislation).

## IX. The Court Should Dismiss Count X Because the Declaratory Judgment Act Does Not Create a Cause of Action.

Finally, the Court should dismiss Count X, which relies exclusively on the Declaratory Judgment Act, 28 U.S.C. § 2201, for a cause of action. As the First Circuit has held, that statute does not "create[] a substantive cause of action," and so plaintiffs "must rely on an independent source for their claims . . . which is capable of being asserted in federal court." *Akins v. Penobscot Nation*, 130 F.3d 482, 490 n.9 (1st Cir. 1997). Here, where Plaintiffs have no claims under the APA, Title IX, or any other statute, they cannot rely upon the Declaratory Judgement Act for a free-floating cause of action.

## CONCLUSION

Defendants respectfully request that the Court grant their motion and terminate this case.

Dated: November 8, 2018

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

ANDREW E. LELLING
United States Attorney

RAYFORD A. FARQUHAR
(B.B.O. # 560350)
Assistant United States Attorney
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
Phone: (617) 748-3100
Fax: (617) 748-3971
E-mail: rayford.farquhar@usdoj.gov

CARLOTTA P. WELLS
Assistant Branch Director
Civil Division

/s/ Benjamin T. Takemoto
STEVEN A. MYERS
(NY Bar # 4823043)
BENJAMIN T. TAKEMOTO
(DC Bar # 1045253)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box No. 883, Ben Franklin Station
Washington, DC 20044
Phone: (202) 532-4252
Fax: (202) 616-8470
E-mail: benjamin.takemoto@usdoj.gov

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon Plaintiffs' counsel,

Wendy J. Murphy, by the Electronic Case Filing system on November 8, 2018.

/s/ Benjamin T. Takemoto
BENJAMIN T. TAKEMOTO

31